## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

| | | |
|---|---|---|
| **JAY McALLEN RUDISILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.**  7:20CV698 |
| | ) | |
| **NORTHROP GRUMMAN** | ) | **JURY TRIAL DEMANDED** |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **SERVE:** | ) | |
| **CT Corporation System,** | ) | |
| **Registered Agent** | ) | |
| **4701 Cox Road, Suite 285** | ) | |
| **Glen Allen, VA 23060** | ) | |
| | ) | |
| **Defendant.** | ) | |

### COMPLAINT

The above-named Plaintiff, Jay McAllen Rudisill ("Rudisill"), by counsel, states as his Complaint against Defendant Northrop Grumman Corporation ("NGC" or "Defendant"), the following:

### JURISDICTION

1. This Court has jurisdiction over this matter as it arises from the federal questions presented by Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and as codified under 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA"), and the Family and Medical Leave Act, as

1

amended, codified at 29 U.S.C. §§ 2601 *et. seq.* ("FMLA"). *See generally* 28 U.S.C. § 1331; 28 U.S.C. §1343(a)(4).

2.   Venue is appropriate, as the acts and/or omissions of NGC from which the causes of action arise occurred within the Western District of Virginia. *See* 28 U.S.C. § 1391(b)(2).

3.   Due to its contacts within the Commonwealth of Virginia, NGC avails itself to the jurisdiction of this Court.

4.   Rudisill timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in December of 2019. Rudisill received a Dismissal and Notice of Rights from the EEOC dated August 26, 2020, attached hereto as **EXHIBIT A**. Rudisill files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.

5.   NGC was an "employer" of Rudisill, as that term is defined under the ADA and, at all times relevant to the Complaint, employed fifteen (15) or more employees.

6.   At all times material hereto, NGC is and was a "person" within the meaning of Title VII, Section 701, 42 U.S.C. §2000e(a). At all times material hereto, NGC was an "employer" within the meaning of Title VII, Section 701, 42 U.S.C. §2000e(b), that is, at all times material hereto, NGC was a person engaged in an industry affecting commerce which had 15 or more employees for each working day in each of twenty or more calendar weeks during the years of Rudisill's employment or the preceding calendar year.

7.   NGC is: (1) engaged in commerce and/or in an industry affecting commerce;

and (2) an employer of fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year, pursuant to the FMLA.

## THE PARTIES

8.  Rudisill, a resident of Pulaski, Virginia, identifies his gender as male and his sexual orientation as heterosexual.

9.  Rudisill suffers from ADA-recognized disabilities/serious health conditions, specifically severe anxiety, Panic Disorder, panic attacks, depression, insomnia, and hypertension, and has suffered injuries to his hand and back while employed with NGC.

10. Rudisill has experienced sex-based discrimination and harassment in the workplace, which has exacerbated his anxiety and he has developed Panic Disorder. This disorder is marked by repeated episodes of high anxiety, which causes shaking, trembling, chest pain, difficulty breathing, sweating, paranoia, and dizziness, all of which occur suddenly and without warning.

11.  At all relevant times, Rudisill performed his job duties in a manner that met or exceeded his employer's expectations.

12. NGC is a publicly traded global technology company that provides services to the government and commercial customers, and is headquartered in McLean, Virginia.

## FACTUAL ALLEGATIONS

13. Rudisill was hired to work as a Production Operator at NGC's Radford Arsenal, which is located at Constitution Road, Radford, VA 24141, in or around July of 2018.

14. Upon information and belief, Rudisill's NGC supervisors and coworkers held a discriminatory animus against Rudisill based upon his sex, their perception that he did not comport with his gender stereotype, and disabilities/serious health conditions, and have subjected him to discrimination and retaliation throughout his employment with NGC.

### Rudisill endured frequent sex-based harassment and discrimination after a workplace injury

15. Rudisill experienced a workplace injury to his hand on or around August 27, 2018 and was subsequently placed on light duty and sent to an occupational physician for review in September of 2018.

16. Rudisill was required to participate in Physical Therapy, was placed on light duty for an approximately six-week period and was required to take a medical leave of absence for three weeks in October 2018.

17. Subsequent to Rudisill's injury, he was subjected to sex-based harassment and discrimination daily based upon the perception that he did not comport with his gender stereotype and/or the perception that Rudisill's sexual orientation was homosexual and/or bisexual, including being called a "pussy" and "Rudipuss" by coworkers as well as a direct supervisor, Chief Jordan Page, and Sam Grissom, Operator.

18. Chief Jordan Page made comments to Rudisill involving homosexual innuendo such as, "You [Rudisill] must like things going up your ass."

19. These comments were repeated by others and continued daily for months.

20. Rudisill requested to Chief Jordan Page and co-workers that the incessant comments cease but to no avail.

21. When Rudisill called attention to safety issues, he also was subjected to comments including being called "a homosexual," "bitch," "fag," and "pussy."

22. Upon information and belief, Rudisill was targeted and harassed because his harassers did not approve of his actions (concerns for safety and being out of work for injuries), and because his actions were perceived as not conforming with his gender expectations, stereotypes and norms.

23. Specifically, Chief Jordan Page, Substitute Chief Ryan (last name unknown), Lead Von Dunford, and employees, such as Zack Payne and David (last name unknown), made discriminatory comments, and Rudisill was regularly asked if he was a "homosexual", and he was also referred to as a "suck-ass" and asked if "his girlfriend [knew] that he liked men," or "are you a fucking fag?" Chief Page took a photo of Rudisill and made him the butt of a joke in the workplace.

**NGC fails to meaningfully address Rudisill's complaints and
Rudisill continues to be subjected to discrimination and harassment.**

24. In or around March of 2019, Rudisill went to Supervisor Jeff Ratcliffe and verbally reported to him the sexually discriminatory and harassing remarks he was experiencing along with safety violations. Rudisill asked that he be re-assigned to a different area so that he would not have to work with Chief Page and employee Sam Grissom, who regularly behaved in an aggressive manner when safety issues were raised.

25. At the beginning of his next shift, Supervisor Ratcliffe asked Rudisill to go into the bathroom to write out a report of the issues Rudisill had raised. Rudisill followed his directive and provided Supervisor Ratcliffe with a written report.

26. Supervisor Jeff Ratcliffe passed Rudisill's report to the Manager of Commercial Powder. Soon thereafter, the Manager met with Rudisill, Supervisor Ratcliffe and Operations Director John Edwards. Rudisill was advised that the report would be turned over to Human Resources.

27. Rudisill's complaint was construed as a safety/ethics investigation.

28. Ratcliffe investigated the safety violation and then responded to it in such a way that the employees knew it was Rudisill who made the complaint.

29. John Edwards, Operations Director, then spoke directly to Rudisill, stating that Ratcliffe "had jumped the gun."

30. However, Rudisill continued to be subjected to sex-based harassment and discrimination, including being called:

- Pussy,
- Rudipuss,
- Snitch,
- Rat,
- Faggot,
- Homo,
- Company Man,
- Bitch,
- Kiss Ass,
- Retard,
- Suckass,
- Cock Sucking Faggot, and
- The Queer.

Comments were posted on social media and made in person around Rudisill such as "Snitches get stitches," "little bitches get stitches," and "Does your girlfriend know you like men?", by coworkers as well leadership.

31. One coworker even tied Rudisill's shoelaces in knots around his locker so

Rudisill was late to work.

### Rudisill experiences a panic attack at work, and is later transferred and forced to remain working alongside his harassers.

32. On or around March 28, 2019, Rudisill experienced a panic attack and severe emotional distress at work. Rudisill was thereafter transferred from the Commercial Powder Department to the Medium Caliber Department and started work there on or around April 4, 2019.

33. This transfer negatively impacted Rudisill's seniority.

34. Just prior to Rudisill beginning work in the Medium Caliber department, Lead Rick Lawson and Supervisor Lucas Gray at Medium Caliber, commented to employees that a "rat" was getting transferred to the department and referred to Rudisill in sex-based derogatory terms like "gaywad" and "faggot."

35. Shortly after he began working in the Medium Caliber Department, his former Chief and harasser, Page, was transferred to his Department.

36. When Rudisill expressed concern about one of his harassers being placed in his new Department, the company advised him that there was nothing they could do about it due to "Union Rules," and that it should not be a problem as Chief Page would be placed on a different shift.

37. However, Rudisill was, again, subjected to sex-based harassment and discrimination daily even after his transfer.

38. Indeed, upon information and belief, Rudisill's new Supervisor Lucas Gray and Lead Rick Lawson were conspiring to have Rudisill fired and initiated the name calling. Frequently, if Rudisill's name came up, Supervisor Gray and Lead Lawson would make

7

sex-based derogatory remarks about him and relate "rumors" about Rudisill engaging in same-sex sexual behavior.

39. When Rudisill reported to Gray that he was still hearing people making harassing comments around him that were directed at him, Gray stated that he could not do anything about it because it was just rumor. As an example, a co-worker sat in the break room while Rudisill was there and stared at him while stating, "I hate a fucking rat." Rudisill was told that unless the comment was stated directly to him, it could not be addressed.

40. However, shortly after his transfer, Gray and Lawson called Rudisill into the office and stated that an anonymous complaint had been made reflecting that Rudisill had said negative things about Gray. Rudisill stated that the complaint was not true. Gray told him that if he heard more of those reports, he would have to investigate and act.

### Rudisill suffers another workplace injury, is accused of "faking" his injury by supervisors and continues to be harassed and discriminated against by supervisors and coworkers.

41. On or around June 4, 2019, Rudisill was injured during a slip after a previous shift had not cleaned the facility correctly.

42. Rudisill injured his back and went through the workers' compensation process.

43. On or around July 22, 2019, Rudisill returned to work. He learned that Supervisor Gray and Lead Lawson had been making comments about Rudisill's perceived homosexuality and/or failure to comport with his gender stereotypes and norms. He was accused of "faking" his injury by Supervisor Gray and Lead Lawson.

44. In fact, while Rudisill was out on leave, Gray directed a coworker who also had a back problem to work on a part of the line that she could not do because of her back injury. When she related to Supervisor Gray that she could not fulfill this duty because of her back injury, Gray derisively dismissed her medical issue which was on file with company and stated, "we don't need another Rudisill."

45. After his return to work and the continued discriminatory conduct, Rudisill met with Barry (last name unknown), Manager of Medium Caliber, on July 22, 2019, to discuss the continuing harassment against him.

46. Barry dismissed Rudisill's concerns and indicated that he thought Rudisill's complaints had been addressed.

47. Rudisill also brought his complaints to Edwards on July 23, 2019 who informed him that unless he had evidence or corroboration, he would "take it as gossip, until someone is willing to come forward," but to take his concerns to the HR Department.

48. Rudisill, accordingly, complained about the ongoing workplace discriminatory conduct he endured in writing to NGC's HR Department on July 29, 2019. In his complaint, Rudisill advised that:

- the harassment was ongoing and became worse after his former harasser, Chief Page, had been transferred to his department;

- he had been subjected to "homosexual" comments and had been called a "rat" and a "snitch"; and

- his supervisors participated in the name-calling conduct.

49. Another investigation ensued, and at one point during the investigation Senior HR Representative Linda Pearrell asked Rudisill again (she had also asked during the

first investigation) if he "identified as homosexual or bisexual" as she just "need[ed] to know."

### Rudisill is discriminated and retaliated against for taking medical leave after experiencing additional panic attacks.

50. On or around July 30, 2019, Rudisill experienced another panic attack and other emotional distress issues, including anxiety, depression, and hypertension, and required medication for his conditions.

51. Rudisill then applied for, and was approved for, immediate FMLA leave to end on or around August 20, 2019.

52. Upon his return to work in August of 2019, Rudisill went to the locker room only to discover that his uniform had the word "FAG" written on it.

53. Rudisill informed the HR Department about the homosexual slur written on his uniform. Pearrell advised him that there was nothing they could do about it, as there would be no way to tell who had defaced the property.

54. At this time, Rudisill's anxiety climbed dangerously, so he subsequently requested, and was approved for, an additional medical leave of absence.

55. Rudisill planned to return to work on November 4, 2019 for his regular 4pm to 2am shift.

56. Unfortunately, he discovered that his car would not start. Given the nature of his shift, he could not find anyone who could pick him up when his shift was over.

57. He called in to the HR Department and asked if he could use emergency vacation leave for a few days until he could get his car fixed.

58. He was aware of another employee being permitted to do the same thing under

the same policies.

59. Pearrell did not return his call for two days. Rudisill continued to make calls to Pearrell and leave messages during this period, but she did not respond.

60. When Pearrell did call on November 6, 2019, she advised Rudisill that the absences would be unexcused and would count against him, that he could not use emergency vacation for this issue, citing a new policy.

61. Upon information and belief, there had not been a policy change for emergency vacation/absences.

62. Rudisill reminded Pearrell that one of his former harassers, Grissom, had been permitted this benefit.

63. Pearrell advised him that she was not discussing the other employee and that his leave would "count against" him.

64. On November 7, 2019, Rudisill called Pearrell to advise her that he was seeking medical treatment for the onset of another panic attack.

65. Pearrell asked him how he was planning to get to medical treatment if he could not get his car running, intimating that his medical issue was not serious.

66. Pearrell further made comments to the effect of, "where are you going with this—isn't it easier to come to work?"

67. Pearrell then stated, "Do what you have to do, and we will do what we have to do."

68. Upon information and belief, Pearrell's comments and conduct were retaliatory, and founded upon a discriminatory animus against Rudisill for his use of medical leave

11

to manage and treat his disabilities/serious health conditions.

69. Rudisill heard nothing further until receiving a letter in the mail on November 29, 2019 denying his request that his absences be excused.

70. Following this interaction and based on the severe distress Rudisill has experienced at work, Rudisill remains on leave.

71.  Because the actions taken by Rudisill's supervisors and coworkers were taken within the scope of their employment, NGC is responsible for their actions based upon the doctrine of *respondeat superior*.

## COUNT I
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

72. Rudisill incorporates by reference herein the preceding paragraphs of this Complaint.

73. At all times material hereto, NGC was an "employer" within the meaning of Title VII, Section 701, 42 U.S.C. §2000e(b).

74. Title VII's prohibition of sex discrimination forbids any employment discrimination based on an employee's actual or perceived sexual orientation.

75. Rudisill, a male who has been treated unfavorably and harassed by supervisors and coworkers based upon his sex, the perception that he does not comport with gender norms, and his perceived sexual orientation, is protected from sex discrimination by Title VII.

76. NGC discriminated against Rudisill by subjecting him to sex-based harassment, failing to meaningfully address his complaints of discriminatory conduct and harassment, transferring Rudisill and negatively impacting his seniority, requiring

Rudisill to work alongside his harassers, treating him differently from, and less preferably than, similarly situated employees, and subjecting him to other discriminatory and differential treatment on the basis of his sex, the perception that he does not comport with gender norms, and his perceived sexual orientation.

77. At all times material hereto, NGC had an obligation to maintain a work environment that was not charged with discrimination to Rudisill.

78. NGC violated federal law by permitting a work environment to exist that was discriminatory to Rudisill, based upon Rudisill's sex, the perception that he does not comport with gender norms, and his perceived sexual orientation.

79. At all times relevant, NGC retained substantial control over the context in which the discriminatory conduct occurred.

80. As a direct and proximate result of NGC's actions, Rudisill has suffered and will continue to suffer loss of income, loss of employment, loss of benefits, harm to his professional reputation, emotional pain, humiliation, embarrassment, anxiety, stress, loss of self-esteem, inconvenience, loss of enjoyment of life, and other non-pecuniary loss.

81. At all times material hereto, NGC engaged in discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Rudisill to support an award of punitive damages.

82. Any reasons proffered by NGC for the adverse employment actions Rudisill has sustained by virtue of NGC's conduct were pretextual as Rudisill's performance was meeting or exceeding NGC's legitimate business expectations.

83. NGC would not have targeted Rudisill or taken the other discriminatory and retaliatory actions against him, but for Rudisill' sex, the perception that he does not comport with gender norms, and his perceived sexual orientation. Alternatively, Rudisill's sex was a motivating factor in NGC's actions.

84. The above-described acts of NGC and employees of NGC constitute sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII

85. Rudisill incorporates by reference the foregoing paragraphs as if fully set forth herein.

86. At all times material hereto, NGC had an obligation to maintain a work environment that was not charged with sex discrimination or hostile to Rudisill and other employees who opposed discriminatory practices and hostility in the work place based on sex, the perception of gender non-conformance, and/or perceived sexual orientation.

87. Rudisill engaged in the protected conduct of complaining about the workplace discrimination and harassment he experienced and was subsequently targeted and retaliated against for making these complaints.

88. NGC violated federal law by permitting a work environment to exist that was discriminatory and hostile to Rudisill and other employees opposing NGC's discriminatory practices and hostility, and retaliated against Rudisill by subjecting him

14

to continued sex-based harassment, failing to meaningfully address his complaints of discriminatory conduct and harassment, transferring Rudisill and negatively impacting his seniority, requiring Rudisill to work with his harassers, treating him differently from, and less preferably than, similarly situated employees, and subjecting him to other discriminatory and differential treatment because he engaged in protected activity.

89. The actions taken against Rudisill would dissuade a reasonable employee from making or supporting a similar complaint.

90. Rudisill was targeted within short temporal proximity to, and in retaliation for, complaining about workplace discrimination and harassment.

91. Throughout Rudisill's employment with NGC, he has performed his work at a satisfactory level — meeting or exceeding NGC's legitimate business expectations.

92. Any reasons given by NGC for its treatment of Rudisill were pretextual, as Rudisill's work performance is excellent.

93. As a direct and proximate result of the actions of NGC, Rudisill has suffered and will continue to suffer damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to his professional reputation, and other pecuniary and non-pecuniary losses.

94. At all times material hereto, NGC engaged in discriminatory and retaliatory practices with malice or reckless indifference to the federally protected rights of Rudisill to support an award of punitive damages.

95. The above-described acts by NGC and employees of NGC constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, as codified under 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

## COUNT III
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF Title VII

96. Rudisill incorporates by reference the foregoing paragraphs as if fully set forth herein.

97. Rudisill, a male who has been treated unfavorably and harassed by supervisors and coworkers based upon his sex, the perception that he does not comport with gender norms, and his perceived sexual orientation, is protected from sex discrimination by Title VII.

98. Rudisill is and was qualified to perform the job for which he was employed by NGC.

99. After Rudisill suffered workplace injuries and demonstrated care and attention to safety, NGC's managers and employees instituted a campaign of harassment and discrimination against him based on his sex, the perception that he did not conform to his gender stereotype, and his perceived sexual orientation, and adopted adversarial attitudes and hostile demeanors.

100.    The harassment was frequent, severe, and pervasive, physically threatening, and continued until Rudisill went out on an extended leave based on the exacerbation of his anxiety.

101.    Rudisill was targeted for harassment and subjected to a hostile work

16

environment by managers and employees because of his sex, the perception that he did not conform with his gender stereotype, and his perceived sexual orientation.

102.     The discriminatory acts involved the same type of employment actions, occurred frequently, were perpetuated and/or directed by the same core group of managers and employees, were egregious, numerous and concentrated, and formed part of the same hostile work environment, as detailed herein.

103.     The discriminatory acts were unwelcomed to Rudisill.

104.     Discriminatory intimidation, ridicule, and insult permeated the work environment, and was sufficiently severe or pervasive to alter the conditions of Rudisill's employment and to create an abusive working environment, as detailed herein.

105.     This hostile environment unreasonably interfered with Rudisill's ability to perform his job duties, which flowed directly from NGC's failure to take prompt and effective action to stop the hostile work environment.

106.     The effects of the hostile environment alleged herein were felt by Rudisill daily. For instance, Rudisill felt intense anxiety and humiliation because of his reasonable fear of continued described harassment at any moment.

107.     Rudisill perceived the working environment to be abusive or hostile and a reasonable person in Rudisill's circumstances would have also considered it so.

108.     NGC's actions occurred because of Rudisill's sex in that he is male, the perception that he failed to conform to his gender stereotype, and because of his

17

perceived sexual orientation. Rudisill would not have been the object of the harassment but for his sex, the perception that he failed to conform to his gender stereotype, and because of his perceived sexual orientation.

109.    NGC was on notice of the hostile work environment, including actual notice by means of complaints made by Rudisill as detailed herein and vicariously and constructively by means of the acts perpetrated by NGC's supervisory employees, as detailed herein.

110.    NGC did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

111.    As a direct and proximate result of NGC's unlawful discrimination, Rudisill incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to his professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for NGC's unlawful hostile work environment.

112.    At all times material hereto, NGC engaged in a practice or practices supporting a hostile work environment with malice or reckless indifference to the federal protected rights of Rudisill to support an award of punitive damages.

## COUNT IV
## DISCRIMINATION AND RETALIATION IN VIOLATION OF THE ADA

113.    Rudisill incorporates herein by reference the preceding paragraphs of this Complaint.

114.     At all times relevant to this Complaint, Rudisill was a qualified individual with disabilities, pursuant to the ADA.

115.     Specifically, and at all times relevant, Rudisill suffered from disabilities/serious health conditions, including Panic Disorder, anxiety, related panic attacks, depression, insomnia, hypertension, and injuries to his hand and back — recognized disabilities under the ADA that impaired Rudisill's daily life activities and/or functions.

116.     In the alternative, Rudisill was regarded by NGC as having such impairments.

117.     At all times relevant, however, Rudisill could perform the essential functions of his position(s) with NGC with or without an accommodation.

118.     Throughout Rudisill's employment with NGC, he has performed his work at a satisfactory level — meeting or exceeding NGC's legitimate business expectations.

119.     Rudisill engaged in the protected conduct of disclosing, and seeking related leave concerning, his disabilities/serious health conditions.

120.     NGC discriminated and retaliated against Rudisill by subjecting him to harassment, failing to meaningfully address his complaints of discriminatory conduct and harassment, transferring Rudisill and negatively impacting his seniority, requiring Rudisill to work alongside his harassers, accusing Rudisill of "faking" his workplace injuries, treating him differently from, and less preferably than, similarly situated employees not seeking medical leave, and subjecting him to other discriminatory and differential treatment.

19

121.     Upon information and belief, NGC's poor treatment of Rudisill was based upon a discriminatory animus against him for his disabilities and his use of protected medical leave to manage and treat his disabilities/serious health conditions.

122.     NGC would not have taken the discriminatory and retaliatory actions against Rudisill, but for his disabilities/serious health conditions and related requests for medical leave.

123.     Any reasons given by NGC for its treatment of Rudisill were pretextual, as Rudisill's work performance at all times relevant was excellent.

124.      NGC's conduct occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon Rudisill's disabilities/serious health conditions.

125.     As a direct and proximate result of NGC's actions, Rudisill has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

126.     At all times material hereto, NGC engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Rudisill to support an award of punitive damages.

127.     The above-described acts by NGC and employees of NGC constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA").

### COUNT V
### DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FMLA

128.    Rudisill incorporates herein by reference the preceding paragraphs of this Complaint.

129.    NGC is: (1) engaged in commerce and/or in an industry affecting commerce; and (2) an employer of fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year.

130.    Rudisill has worked for NGC for more than two (2) years and worked more than 1,250 hours during the relevant twelve (12) month period.

131.    Rudisill engaged in the protected conduct of notifying NGC of his disabilities/serious health conditions, and of his need for FMLA-qualifying leave, to which he was entitled, to treat and manage his disabilities/serious health conditions.

132.    NGC discriminated and retaliated against Rudisill by subjecting him to harassment, failing to meaningfully address his complaints of discriminatory conduct and harassment, transferring Rudisill and negatively impacting his seniority, requiring Rudisill to work alongside his harassers, accusing Rudisill of "faking" his workplace injuries, retaliating against him for exercising the substantive FMLA rights to which he was entitled, and treating him differently, and less favorably, than similarly situated employees not exercising FMLA rights.

133.    Upon information and belief, NGC's poor treatment of Rudisill was based upon a discriminatory animus against him for his use of protected medical leave to manage and treat his disabilities/serious health conditions.

21

134.     NGC would not have taken the discriminatory and retaliatory actions against Rudisill, but for Rudisill's requests related to, and use of, FMLA leave.

135.     Any reasons given by NGC for its treatment of Rudisill were pretextual, as Rudisill's work performance at all times relevant was excellent.

136.     NGC's discriminatory and retaliatory conduct prejudiced Rudisill in that he lost compensation and benefits, and sustained other monetary losses, as a direct result of NGC's violation.

137.     As a direct and proximate result of NGC's actions, Rudisill has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

138.     At all times material hereto, NGC engaged in unlawful or discriminatory practices with bad faith, malice, or reckless indifference to the federally protected rights of Rudisill to support an award of liquidated damages.

139.     The above-described acts by NGC and employees of NGC constitute unlawful discrimination and/or retaliation in violation of the Family Medical Leave Act, as codified under Title 29 of the United States Code §§ 2601 *et seq.* ("FMLA").


WHEREFORE, Jay McAllen Rudisill prays for judgment against NGC for equitable relief, back pay, front pay, compensatory damages, consequential damages, punitive and/or liquidated damages, together with prejudgment interest, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY IS DEMANDED.

Respectfully submitted,

**JAY McALLEN RUDISILL**

/s/ Monica L. Mroz
Thomas E. Strelka, Esq. (VSB# 75488)
Brittany M. Haddox, Esq. (VSB #86416)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB #92598)
Monica L. Mroz, Esq. (VSB # 65766)
STRELKA EMPLOYMENT LAW
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA 24011
Tel:  540-283-0802
thomas@strelkalaw.com
brittany@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff Rudisill*

23